# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| COMMISSIONER OF LABOR | * | |
| AND INDUSTRY, to the use and benefit | * | |
| of Valerie Steele, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.: RBD-25-1746 |
| | * | |
| WASHINGTON METROPOLITAN | * | |
| AREA TRANSIT AUTHORITY | * | |
| (WMATA), | * | |
| Defendant. | * | |

## DECLARATION IN SUPPORT OF
## PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS

I, Valerie Steele, the declarant, hereby declare and state, pursuant to 28 U.S.C. §1746, as follows:

1. I am over the age of eighteen (18) years and am fully competent to make this declaration. I have personal knowledge of the facts stated herein, which are true and correct.

2. I was hired by the Washington Metropolitan Area Transit Authority ("WMATA") on or about October 21, 2021. I was employed by WMATA as the Director of Occupational Safety and Health for the duration of my employment.

1

Exhibit C

3. My position as the Director of Occupational Safety and Health required me to initially report to WMATA's New Carrollton, Maryland location. The New Carrollton station is located at 4100 Garden City Drive, Hyattsville, MD 20784. I subsequently reported to the Shady Grove, Maryland location. The Shady Grove station is located at 15903 Somerville Drive, Rockville, MD 20855.

4. My job duties as the Director of Occupational Safety and Health included, but were not limited to, creating and implementing a strategic plan to stand up a fully functional Office of Occupational Safety and Health ("OSH"). This plan included developing occupational safety and health programs necessary for WMATA to provide a workplace free of recognized hazards for employees and overseeing the OSH staff. I supervised a total of five employees including one electrical safety engineer, two occupational safety engineers and two industrial hygienists.

5. For the duration of my employment, WMATA conducted performance evaluations or "Performance Documents" to review employee performance. With respect to my Performance Document that encompassed the period from July 1, 2021 through June 30, 2022, I received ratings of either four (4) or five (5) out of a total possible score of five (5). I was rated a "solid" or "high performer" and was assessed to have either "completely met" or "significantly exceeded" the requirements for my position. With respect to my Performance Document that encompassed the period from July 1, 2022 through June 30, 2023, I was again rated a "solid performer." In part, my evaluation noted that I brought "a significant amount of subject matter experience to [my] role," that I had "a deep understanding of theoretical knowledge and situations," and that I excelled "in helping internal customers develop solutions for worker safety concerns."

6. In bi-weekly reports dated September 16, 2022 through September 22, 2023, I requested resources to perform occupational exposure monitoring. Regulatory requirements call for worker exposure assessments that identify and evaluate workplace hazards, estimate employee exposure levels, and implement controls to mitigate risks. The monitoring would have provided analysis for metals including lead, cadmium, copper, zinc, mercury, cobalt, molybdenum and iron; silica fibers; for dust particle sizes and polycyclic aromatic hydrocarbons ("PAH"). Despite my documentation of the need to perform exposure assessments, funding was denied by Theresa Impastato, WMATA's Chief Safety Officer.

7. In May of 2023, I secured funding, through the Capital Group, to perform the necessary occupational exposure assessments for WMATA's tunnel and ancillary room workers. I developed, along with Doug Fallon, a Certified Industrial Hygienist who I supervised, a comprehensive sampling proposal and met with a contractor who would perform the metals, silica fibers, dust particle sizes and PAH sampling. Jayme Johnson, WMATA's Vice President and Assistant Chief Safety Officer, learned of my progress. At that time, he unsuccessfully attempted to move this project from my oversight to a colleague, Claire Fox. I insisted that the exposure assessment plan ("EAP") remain under the control of my group, because Mr. Fallon was in charge of the project. I was terminated within weeks of the start of monitoring.

8. Beginning in July of 2023, Mr. Johnson and I met for bi-weekly meetings to check my progress. Because Mr. Johnson does not have a background in occupational safety and health, I spent considerable time in these meetings explaining technical aspects of programs. These meetings were conducted via Microsoft Teams and my project manager, Marco Rosado, was present for all meetings. Mr. Johnson never verbalized any concerns

3

regarding the quality of my programs, my work product or my team's progress. Rather, Mr. Johnson only provided positive feedback.

9. On or about September 4, 2023, Mr. Johnson called me to advise that because my direct supervisor, Dr. Francine James, Senior Director of Safety Risk Management, was leaving employment with WMATA on September 11, 2023, he did not plan to open Dr. James' position for applications. Michael Vitale replaced Dr. James as Senior Director of Safety Risk Management upon her departure from WMATA and became my direct supervisor. Mr. Johnson advised that he planned to create a second Senior Director Position, and wanted me to fill that opening. Despite Mr. Johnson's representations, I remained in my position as Director of Occupational Safety and Health.

10. On or about October 1, 2023, I was assigned to assist the Office of Emergency Preparedness ("OEP") in investigating lead contamination in railway tunnels and ancillary rooms under WMATA's jurisdiction.

11. On or about October 11, 2023, a WMATA employee expressed concerns to me regarding lead contamination in WMATA's railway tunnels. The employee advised that he worked in an ancillary room, cleaning emergency cabinets within the tunnels, and was covered in dust for over one hour. Mr. Fallon met with the worker to obtain additional information about the worker's activities, procedures and protocols. Following these discussions, and after reviewing a 2019 environmental report prepared by an external source,[1] I believed that it was necessary to cease all maintenance activities in the tunnels and ancillary rooms until appropriate personal protective equipment ("PPE") could be provided to WMATA employees, and until protocols could be implemented in all affected WMATA work

---

[1] Mr. Fallon received the report from an environmental group. The report, which I was previously unaware existed, indicated surface contamination of various metals including lead at the Red Line Medical Center Metro location.

4

areas. I also determined that medical monitoring should be conducted for the WMATA employees working in the suspected lead-contaminated areas in order to gauge their exposure to lead and other metals that were referenced in the 2019 environmental report. On that same day, I met with Mr. Vitale, Mr. Johnson and Mr. Fallon. In that meeting, I informed WMATA of my concerns and the need for medical monitoring, as there was a historical absence of personal exposure monitoring. Medical monitoring would have directly measured workers' exposure to metals within days of testing. Subsequent testing by an independent contractor confirmed the cabinet dust had heavy lead contamination.

12. On or about October 13, 2023, Mr. Fallon and I met with WMATA Plant Maintenance Management via Microsoft Teams. I provided an update regarding the stop on maintenance work until proper safety protocols could be put in place. Additionally, I met with Dr. Amy Espy-Smith, WMATA's Medical Director, via Microsoft Teams. In our meeting, I explained the necessity of medical monitoring. Dr. Espy-Smith expressed her support of medical monitoring and indicated that she would provide supplies as necessary. Mr. Johnson called Mr. Fallon and I later that same day. Mr. Johnson stated that prior to proceeding, he required all other WMATA executives to agree to the medical monitoring program. Mr. Fallon and I disagreed with Mr. Johnson's position, and believed that he was hindering our professional industrial hygiene safety protocols. Finally, after I spoke with Mr. Johnson, Mr. Vitale called me and requested that I report to an in-office meeting on October 16, 2023 at 9:30 am at WMATA Headquarters in Washington, D.C.

13. On or about October 14, 2023, I advised Mr. Johnson that a Respirable Silica Program was prepared and ready for WMATA's signature. Mr. Johnson responded that the document would not be signed until the protocol was explained to Mr. Vitale.

14. On or about October 16, 2023, I reported to the in-person meeting requested by Mr. Vitale. Only Mr. Vitale, one person who I did not know, and I were present for this meeting. At that time, I was terminated from my employment with WMATA, effective immediately. I was required to immediately surrender my WMATA identification, keys, computer and virtual private network ("VPN").

15. At the time of my termination, WMATA offered no reason for my firing. When I pressed Mr. Vitale for a reason, he stated that there was no reason for my termination. When I asked Mr. Vitale whether the decision to terminate my employment came from Mr. Johnson or Ms. Impastato, Mr. Vitale would not answer.

16. On or about November 17, 2023, I filed a complaint with the Maryland Occupational Safety and Health Agency ("MOSH"), alleging discrimination under the MOSH Act. After filing my discrimination complaint, WMATA told MOSH that the reason for my termination was poor job performance.

17. I was terminated from my employment because I reported concerns about WMATA employee exposure to lead dust in tunnels and ancillary rooms, and I requested that WMATA monitor employee exposure to potentially harmful substances. When I requested that WMATA stand down work in the affected areas, Mr. Johnson told me to "test the air." This statement contradicted previous WMATA advice that there were no financial resources available to support occupational exposure testing. Additionally, ceasing maintenance work in tunnels would have affected WMATA's service.

18. With respect to the assertions made by Mr. Johnson in his Declaration dated June 13, 2025, I state the following:

    a. With respect to Paragraph 5 of Mr. Johnson's Declaration, Dr. James had concerns that my team was not receiving adequate resources and funding. Dr. James attempted to finalize a subcontract to provide a program manager and safety specialists to the Office of Occupational Safety and Health at WMATA. During my tenure at WMATA, I developed a project plan which included full implementation steps for each program, including a timeline for each step. Mr. Johnson declared that my draft documents were "difficult to comprehend." However, Mr. Johnson had no background or experience with occupational safety and health prior to working at WMATA. I was not "out of touch with [my] operational colleagues;" rather, I had frequent and reoccurring meetings with these individuals. Finally, Dr. James never indicated to me that she was "maintaining close supervision" over my performance. There is no documentation to support this assertion. I only received positive performance reviews during my tenure at WMATA.

    b. With respect to Paragraph 6, I did prepare a presentation before the Washington Metrorail Safety Commission ("WMSC"). The presentation was successful. David Mayar, the previous president of the WMSC, was happy with the direction in which I was taking WMATA's occupational safety and health program, and he complimented me on my "professionalism." I never received any feedback from either Mr. Johnson or Mr. Vitale. Ms. Impastato told me that the strategy contained in my presentation was "transformational."

7

c. With respect to Paragraph 9, Mr. Vitale never spoke with me regarding my team's alleged lack of progress and prioritizations.

d. With respect to Paragraph 11, my briefing was not disorganized. Mr. Johnson is specifically referring to an electronic database maintained by WMATA. The database was not accurate enough to determine, in real time, which WMATA personnel needed to complete fall protection training. I never maintained the database; therefore, its accuracy was not something within my control.

e. With respect to Paragraph 12, the urgent communication referred to by Mr. Johnson was sent on a Saturday at 8:00 pm. My position as Director of Occupational Safety and Health did not require me to be "on call" outside of core work hours. Given the time the urgent communication was sent, I did not immediately see Mr. Johnson's email. I responded between 12:30 am and 1:00 am on Sunday. Two of my colleagues were also included in the urgent communication. Neither of those individuals ever provided responses.

f. With respect to Paragraph 13, I did not receive any negative feedback from either Mr. Johnson or Mr. Vitale either during or after meetings. As someone who has focused on worker safety and health for over twenty-five years, I am considered a subject-matter expert in that field.

g. With respect to Paragraph 14, Mr. Vitale never shared a write-up of any alleged performance concerns with me. After his promotion to Senior Director on or about September 10, 2023, Mr. Vitale never personally spoke with me regarding his new role as my supervisor, his expectations as my supervisor, and certainly not any concerns regarding my work performance.

I am executing this declaration within the United States of America. I declare under penalty of perjury that the foregoing is true and correct.

11-10-2025

Date

*Valerie M. Steele*

Valerie M. Steele